Filed 3/19/14  In re T.V. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re T.V., a Person Coming Under the Juvenile Court Law. | B251396 (Los Angeles County Super. Ct. No. CK71493) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. C.V. et al., Defendants and Appellants. | |

APPEAL from an order of the Superior Court of the County of Los Angeles, Debra Losnick, Commissioner.  Affirmed.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant C.V.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant M.H.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Navid Nakhjavani, Deputy County Counsel for Plaintiff and Respondent.

## INTRODUCTION

M.H. (mother) and C.V. (father) (collectively the parents) appeal from the juvenile court's order terminating their parental rights over their daughter, T.V. (born August 2012) under Welfare and Institutions Code section 366.26.[1] Mother contends that the juvenile court erred in failing to find the parental visitation exception to the termination of parental rights under section 366.26, subdivision (c)(1)(B)(i). Father contends that if mother's parental rights are reinstated, his parental rights must be reinstated as well.

The juvenile court acted within its discretion in concluding that termination of parental rights would not be detrimental to T.V. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Child Welfare History

In May 2008, the juvenile court sustained a section 300 petition filed on behalf of one of T.V.'s siblings (injured sibling[2]) after injured sibling was medically examined in January 2008, and found to be suffering a detrimental condition consisting of a fracture of the distal right femur with deep tissue swelling and a pelvic blood drainage condition. The parents' explanations of injured sibling's injuries were not consistent with the actual injuries. In September 2008, the juvenile court sustained a section 300 petition filed on behalf of T.V.'s second sibling K.V., based on injured sibling's injuries.

In March 2010, the juvenile court terminated the parents' family reunification services and in August 2010, terminated the parents' parental rights over injured sibling and K.V. On December 13, 2011, the adoptions of injured sibling and K.V. were finalized. In October 2010, the juvenile court sustained a section 300 petition filed on

---

[1]    All statutory citations are to the Welfare and Institutions Code.

[2]    T.V.'s minor siblings have unique first names that may defeat the objective of anonymity if they are used here. We therefore use initials for them instead of their first names and first initial of their last name. Two of T.V.'s minor siblings share the same initials. We therefore refer to one of those two siblings as "injured sibling."

behalf of T.V.'s third sibling, K.H., and in May 2012, terminated the parents' family reunification services regarding the child.

## B. Current Circumstances

The Department filed a detention report, dated August 10, 2012, stating that on August 7, 2012, plaintiff and respondent Department of Family and Children's Services (Department) received a referral alleging that mother may be using drugs. According to the referral, mother was admitted to the hospital to give birth to T.V., had not received any prenatal care, and mother's hospital room emanated an odor of marijuana. According to the referral, mother refused to cooperate with hospital staff in that she would not provide any identification, complete T.V.'s birth certificate, or fill out T.V.'s application for medical insurance. Mother provided the hospital staff with two different-home addresses and various dates of birth, and refused to provide information on her other children to hospital staff. Mother provided the Department with a false name.

The August 10, 2012, report stated that the Department told mother that it was placing T.V. in protective custody because her safety could not be assessed, and provided mother with information about the up-coming court date. Mother responded, "I know where this place is. This is why I don't trust you motherfuckers. Bring me my baby before I knock you out. I'm not kidding. You better bring me my baby before I get my attorney and the news up here." T.V. was placed in the same foster home as one of her siblings, K.H.

On August 10, 2012, Department filed a petition on behalf of newborn T.V., pursuant to section 300, subdivisions (a),(b) and (j), based on injured sibling's injuries, and that three of T.V.'s siblings—injured sibling, K.V., and K.H.—were receiving permanent placement service due to those injuries.

At the August 10, 2012, detention hearing, the juvenile court found a prima facie case for detaining T.V. and that she was a minor described by section 300, subdivisions (a), (b), and (j). The juvenile court ordered the parents to receive monitored visits with T.V. "3 [times] or 3 hours per week."

3

The Department filed a jurisdiction/disposition report, dated September 14, 2012, stating that there were not any concerns regarding the parent's weekly supervised visits with T.V. and that the parents interacted appropriately at visits. On November 9, 2012, T.V.'s caregivers filed a caregiver information form stating that mother visited T.V. about once a week for two to three hours from August 9, 2012, through November 1, 2012.

The Department filed an interim review report dated November 14, 2012, stating that the parents were largely compliant with visitation, visiting T.V. at the Department's office for three hours every Thursday. The Department reported that the parents were appropriate with T.V., took turns holding and feeding her, and spent time bonding with her. The report attached T.V.'s multidisciplinary assessment team summary of findings report stating that mother refused to participate in the assessment. T.V.'s caregivers participated in the assessment and stated that T.V. did not show any signs of distress, was comfortable with them, recognized their voices, and "knows them as home." The Department observed that T.V. appeared be attached to, and comfortable with, her caregivers, and her caregivers wanted "to provide permanency for T.V. The Department stated that T.V.'s sister, K.H., lived in the same home and was reportedly loving and affectionate toward T.V. T.V. appeared to have adjusted well to her placement and was making progress toward meeting age appropriate developmental milestones. On November 14, 2012, the juvenile court terminated the parents' parental rights over K.H.

The Department filed an interim review report, dated February 13, 2013, stating that the parents visited T.V. at the Department's office for three hours every Thursday. The Department again reported the parents were appropriate with T.V., took turns holding and feeding her, and spent time bonding with her. The Department's Dependency Investigator reported that mother was "very reluctant" to speak with her and "did not provide any information regarding what steps [mother] had taken to address the issues that brought her family to the attention of [Department] and the court."

At the February 13, 2013, jurisdictional hearing, the juvenile court sustained the petition filed on behalf of T.V. At the February 14, 2013, contested dispositional

4

hearing, the juvenile court denied both parents family reunification services, and ordered monitored visits for the parents.

The Department filed a status review report, dated May 15, 2013, stating that T.V. continued to reside in the home of her caregivers, along with her sister, K.H.; T.V.'s caregivers had applied to adopt T.V.; and T.V. was meeting her developmental milestones. The Department observed that T.V.'s caregivers appeared to be loving and caring toward T.V. The caregivers said K.H. enjoyed having her little sister, T.V., in the home; was very playful with her; and was attentive to her needs. K.H. and T.V. shared a bedroom at the caregivers' home.

The May 15, 2013, status review report states that mother regularly visited T.V. every Thursday for about three hours. The Department reported, "[T]he child appears to enjoy visits with the parents. Initially there were issues with [T.V.] being unable to be comforted by the parents as [T.V.] was unfamiliar with the parents and displaying appropriate 'stranger danger' reflexes and one occasion the visit had to be terminated early as [T.V.] was crying for the majority of the visit. More often than not [T.V.] appears to enjoy visits with the parents. The [p]arents are appropriate in bringing necessary items for the child including formula, food, diapers, [and] entertainment items such as toys and music."

The Department filed a section 366.26 report, dated May 15, 2013, stating that T.V. was adoptable and had adjusted well to the home of her caretakers who were meeting all of T.V.'s needs. The Department had discussed the consequences and responsibilities of adoption with T.V.'s caretakers, and they were committed to providing T.V. with a loving, stable home. The Department recommended that the juvenile court terminate parental rights over T.V.

The Department prepared a delivered service log for weekly detailing the parents' weekly visits with T.V. from November 15, 2012 through June 6, 2013. Overall, mother's visits with T.V. were positive, appropriate and affectionate.

On July 1, 2013, the Department filed a last minute information for the court report stating that, "It is highly likely that [T.V.] will be adopted should parental rights be

terminated. [T.V.] was placed with the prospective adoptive parents on August 8, 2012. The prospective adoptive parents have expressed a strong desire to adopt [T.V.] as they had her since birth. As indicated by the prospective adoptive parents, [T.V.] appears to be well adjusted, happy and well cared for in her placement. The prospective adoptive parents appear to be meeting all of [T.V.]'s medical, emotional and physical needs. The prospective adoptive parents have completed an adoption home study, which was approved on August 28, 2012 . . . and an updated home study was approved on June 26, 2013. . . . The prospective adoptive parents are therefore ready to proceed with adoption should parental rights be terminated. Therefore, the Department anticipates no difficulties or delays in proceeding with adoptive placement and finalizing [T.V.]'s adoption should parental rights be terminated."

A section 366.26 hearing was held on September 17, 2013. T.V. was about one year old.

Christopher Perdue, a children's social worker (CSW) with the Department, testified at the hearing that since T.V. was detained mother regularly and consistently visited T.V. at the Department's office on a weekly basis, three house each week. Mother acted appropriately during the visits, was attentive to T.V., engaged in appropriate play activities with her, and occasionally played music for T.V. Mother's visits with T.V. were positive, and Perdue did not have any concerns with mother's interactions with T.V. Mother brought appropriate items to the visits, including food, toys, and cold medicine. Purdue agreed that "it appear[s] as if mother acts in a motherly role while visiting [T.V.]" Mother fed and cared for T.V., changed T.V.'s diaper when appropriate, "and [did] the things a mother would do . . . ." T.V. smiled at and reacted to mother.

Perdue testified that, "[the parents were] not there as much as parents would be because of the situation. The bond, as I say, wouldn't be as strong with biological parents if they were living with [T.V.], but [T.V.] [did] enjoy the visits." The parents have never visited with T.V. outside of the Department's offices. Mother has only been alone with T.V. during the hospital stay when T.V. was born. Perdue testified that, "I

don't believe that visits are enough for the case to be continued and for the case to not be terminated."

Father testified at the hearing that mother does "motherly things" with T.V., including playing "peek-a-boo" with her. Mother was attentive to T.V. during the visits. Father said that he had heard T.V. say "mom" to mother. Father testified, "[W]e only have a small, small room as well as a . . . small amount of time to work with [T.V.] and understand what she likes and what she dislikes as she gets older."

Mother's counsel joined with father's counsel in requesting that the juvenile court apply the parent-child beneficial relationship exception and not terminate parental rights. T.V.'s counsel acknowledged the parents' regular and positive visitation with T.V. but argued, "I don't believe that the court can find that what the parents have done thus far meet that—where it would cause a detriment to [T.V.] if the court terminated parental rights." The Department's counsel agreed, stating that the parents had only monitored visits with T.V., have never had custody of T.V., and have not maintained a parental role with her.

The juvenile court found that the parental visitation exception to the termination of parental rights under section 366.26, subdivision (c)(1)(B)(i) did not apply, and terminated parental rights over T.V., stating, "I agree with [T.V.'s counsel] that the father's testimony was—I think she used the word 'impressive.' What the social worker said was what the mother did was what a parent would do. I don't know that he said she does everything a mother would do which would be essentially the same thing. [¶] It is clear to me that the parents did what they could as the child's parents during visits, but the court cannot look at that exclusively. That is not what the statute requires that I do. [¶] . . . This child is very clearly adoptable. [¶] I agree with counsel's assessment that Autumn H. essentially means pretty much daily parenting. It doesn't mean the three hours that you have during a monitored setting in a D.C.F.S. office. [¶] [T]his court cannot find a compelling reason which would prevent me from following the Department's recommendation to terminate parental rights as the court is charged with doing, finding a permanent home for children that find themselves in a .26

7

situation.  [¶]  The benefit of the relationship currently is not outweighed by this child having a permanent home and being with her sibling. [¶]  . . .  [¶] The court is not finding that any exception or legal impediment applies to this case, and I am ordering that parental rights be severed, that this child be placed for adoption."

## DISCUSSION

### A.     Standard of Review

"Section 366.26 provides an exception to the general legislative preference for adoption when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)) because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.  . . ." (§ 366.26, subd. (c)(1)(B)(i).)  [¶]  For years California courts have diverged in their view about the applicable standard of review for an appellate challenge to a juvenile court ruling rejecting a claim that an adoption exception [i.e., the parental visitation exception] applies.  Most courts have applied the substantial evidence standard of review to this determination (see, e.g., *In re Autumn H*. [(1994)] 27 Cal.App.4th [567,] 576; *In re L. Y. L.* (2002) 101 Cal.App.4th 942, 953 [124 Cal.Rptr.2d 688]), although at least one court has concluded that it is properly reviewed for an abuse of discretion (*In re Jasmine D*. [(2000)] 78 Cal.App.4th [1339,] 1351).  Recently, the Sixth Appellate District has cogently expressed the view that the review of an adoption exception incorporates both the substantial evidence and the abuse of discretion standards of review.  (*In re Bailey J*. (2010) 189 Cal.App.4th 1308, 1314-1315 [117 Cal.Rptr.3d 568] (*Bailey J*.).)  The *Bailey J*. court observed that the juvenile court's decision whether an adoption exception applies involves two component determinations: a factual and a discretionary one.  The first determination—most commonly whether a beneficial parental or sibling relationship exists, although section 366.26 does contain other exceptions—is, because of its factual nature, properly reviewed for substantial evidence. (189 Cal.App.4th at p. 1314.)  The second determination in the exception analysis is

8

whether the existence of that relationship or other specified statutory circumstance constitutes 'a compelling reason for determining that termination would be detrimental to the child.' (§ 366.26, subd. (c)(1)(B); see *Bailey J*., at p. 1315.) This "'quintessentially" discretionary decision, which calls for the juvenile court to determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption,' is appropriately reviewed under the deferential abuse of discretion standard. (*Bailey J.,* at p. 1315.)" [3] (*In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) We apply the standard of review set forth in *In re K.P.*

## B.     Applicable Law

The parental visitation exception in section 366.26(c)(1)(B)(i) provides that parental rights will not be terminated and a child freed for adoption if parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." Parents bear the burden of establishing that the visitation exception to termination of parental rights applies. (*In re Zachary G*. (1999) 77 Cal.App.4th 799, 809.)

Application of the parental visitation exception requires a two-prong analysis. (*In re Aaliyah R*. (2006) 136 Cal.App.4th 437, 449-450.) The first is whether there has been regular visitation and contact between parent and child. (*Id*. at p. 450.) The second is whether there is a sufficiently strong bond between parent and child that the child would suffer detriment from its termination. (*Ibid*.) The parent/child relationship must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If

---

[3]     "The practical differences between the [substantial evidence and abuse of discretion] standards of review are not significant." (*In re Jasmine D*., *supra*, 78 Cal.App.4th at p. 1351.)

severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; *In re Dakota H*. (2005) 132 Cal.App.4th 212, 229.) The visitation exception does not apply when a parent fails to occupy a parental role in his child's life. (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350; *In re Beatrice M*. (1994) 29 Cal.App.4th 1411, 1418-1419; *In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

Whether the exception applies is determined "on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.)

## C.     Analysis

The Department concedes that mother has shown that she maintained consistent and regular contact with T.V., but contends that the juvenile court did not abuse its discretion by determining that the relationship did not constitute a compelling reason for concluding that termination of mother's parental rights would be detrimental to T.V.

Mother contends that the juvenile court erred because there was evidence that she assumed a motherly role with T.V. during mother's weekly three-hour visit with her, and the juvenile court "stated that it thought that in order for the exception to apply, daily parenting was required . . . ." "The relationship that gives rise to [the parental visitation] exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not

10

necessarily required, although it is typical in a parent-child relationship.' [Citation.]" (*In re K.P., supra,* 203 Cal.App.4th at p 621.)

The juvenile court stated that "pretty much" daily parenting was required for the parental visitation exception to the termination of parental rights to apply. Even if the juvenile court statement reasonably means that it believed daily parenting was required for the exception to apply, and is not necessarily a correct statement of the law, "[i]t is the ruling, and not the reason for the ruling, that is reviewed on appeal." (*Muller v. Fresno Community Hospital & Medical Center* (2009) 172 Cal.App.4th 887, 906-907; *Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1216; *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 876.)

"[T]o establish the exception in section 366.26, subdivision (c)(1)(A), parents must do more than demonstrate 'frequent and loving contact' [citation], an emotional bond with the child, or that the parents and child find their visits pleasant. [Citation.]" (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108.) A parent must show that a benefit to the child from continuing the relationship would result. (*In re Mary G.,* (2007) 151 Cal.App.4th 184, 207; *In re Derek W.* (1999) 73 Cal.App.4th 823, 826-827.) "The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.]" (*In re Mary G., supra*, 151 Cal.App.4th at p. 207; see *In re Helen W.* (2007) 150 Cal.App.4th 71, 80-81; *In re Beatrice M., supra*, 29 Cal.App.4th at pp. 1416-1418.) "Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.]" (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.)

Although day-to-day contact between the parent and child is not necessarily required, it is nonetheless typical in a parent-child relationship. (*In re K.P., supra,* 203 Cal.App.4th at p. 621.) "'[B]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the

11

Legislature's preference for adoptive placement.' [Citation.]" (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.) It is the legislator's "intent that adoption should be ordered unless exceptional circumstances exist, one of those exceptional circumstances being the existence of such a strong and beneficial parent-child relationship that terminating parental rights would be detrimental to the child and outweighs the child's need for a stable and permanent home that would come with adoption. That showing will be difficult to make in the situation, such as the one here, where the parents have essentially never had custody of the child nor advanced beyond supervised visitation. The difficulty is due to the factual circumstances of the parents in failing to reunify and establish a parental, rather than caretaker or friendly visitor relationship with the child." (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 51.)

As in *In re Casey D.*, *supra*, 70 Cal.App.4th 38, mother here never had custody of T.V. It is undisputed that mother visited T.V. on a regular basis, albeit in a monitored setting. It is equally undisputed, however, that mother's visitation never advanced from the three hours per week initially ordered by the juvenile court in August 2012, or to an unmonitored setting. There is evidence that for over one year, mother made little or no progress in occupying a parental role in T.V.'s life.

By contrast, at the time of the section 366.26 hearing, the evidence confirmed that T.V. was securely bonded to her prospective adoptive parents. According to T.V.'s MAT assessment, she appeared attached to, and comfortable with, them. She was sleeping and feeding well and making progress toward meeting age appropriate developmental milestones. T.V.'s prospective adoptive parents completed their home study program. They reported that T.V. did not show any signs of distress, was comfortable with them, recognized their voices, and knew them as "home." The Department stated that T.V. was attached and bonded to her prospective adoptive parents with whom T.V. had lived her entire life.

Based on the evidence it was not arbitrary, capricious, or patently absurd—the criteria for an abuse of discretion (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 70, 71)— for the juvenile court to conclude that termination of mother's parental rights would not be detrimental to T.V.  The juvenile court did not abuse its discretion in concluding that the benefits to be derived by T.V. from adoption by a family to which she was bonded outweighed any benefit T.V. might derive from a continued relationship with mother. The juvenile court also did not abuse its discretion in determining that the evidence did not support a reasonable inference that this was the "extraordinary" type of case necessary to overcome the statutory preference for adoption.

**DISPOSITION**

The juvenile court's order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, J.


We concur:


TURNER, P. J.


KRIEGLER, J.

13